IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JACQUELINE CONNELL, | ) | 2:08-cv-0062-GEB-CMK |
| Plaintiff, | ) | ORDER |
| v. | ) | |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

A three day bench trial in this Federal Tort Claims Act action against the United States of America ("defendant") concluded on January 14, 2010. The trial concerned plaintiff's claim that her physician subjected her to intentional infliction of emotional distress ("IIED") by sexually harassing conduct and comments.

## I. FINDINGS OF FACT

1. Plaintiff was first seen at Shasta Community Health Center ("SCHC") in December 2001.
2. In January 2006, plaintiff began seeing Dr. Laurence Heard at SCHC for treatment of depression she had following a break up with her boyfriend, who left her on December 25, 2005.

|   |   |   |
|---|---|---|
| 1 | | Plaintiff was still being treated for this depression in August 2006. |
| 2 | 3. | In June 2006, Dr. Heard referred plaintiff to Dr. Frank LiVolsi, a gynecologist and surgeon at SCHC, for evaluation of her uterine fibroids. |
| 3 | 4. | Subsequently, plaintiff was examined or treated by Dr. LiVolsi eight times during the period of August 2006 through November 2006. |
| 4 | 5. | Plaintiff's first appointment with Dr. LiVolsi was on August 24, 2006. At the beginning of the appointment, Dr. LiVolsi introduced himself to plaintiff and they shook hands. |
| 5 | 6. | Dr. LiVolsi, Suzanne Mueller LVN, and medical resident Tawana Nix, were in the room with plaintiff for the entire August 24, 2006 appointment. |
| 6 | 7. | Plaintiff testified when she first saw Dr. LiVolsi in the examination room he told her she had "real pretty eyes." Dr. LiVolsi was aware of plaintiff's medical history concerning her depression, and was interested in bolstering plaintiff's self-esteem and comforting her. During that appointment, Dr. LiVolsi examined plaintiff, and then allowed medical resident Tawana Nix to examine her. Dr. LiVolsi held plaintiff's hand during Nix's examination of her. |
| 7 | 8. | Plaintiff went back to see Dr. LiVolsi on September 7, 2006. At that appointment, Dr. LiVolsi recommended that plaintiff have a subtotal hysterectomy, which involves removal of the uterus while preserving and leaving in place the ovaries and cervix. LVN Suzanne Mueller was present during the entire appointment. |


1. Plaintiff was still being treated for this depression in August 2006.

3. In June 2006, Dr. Heard referred plaintiff to Dr. Frank LiVolsi, a gynecologist and surgeon at SCHC, for evaluation of her uterine fibroids.

4. Subsequently, plaintiff was examined or treated by Dr. LiVolsi eight times during the period of August 2006 through November 2006.

5. Plaintiff's first appointment with Dr. LiVolsi was on August 24, 2006. At the beginning of the appointment, Dr. LiVolsi introduced himself to plaintiff and they shook hands.

6. Dr. LiVolsi, Suzanne Mueller LVN, and medical resident Tawana Nix, were in the room with plaintiff for the entire August 24, 2006 appointment.

7. Plaintiff testified when she first saw Dr. LiVolsi in the examination room he told her she had "real pretty eyes." Dr. LiVolsi was aware of plaintiff's medical history concerning her depression, and was interested in bolstering plaintiff's self-esteem and comforting her. During that appointment, Dr. LiVolsi examined plaintiff, and then allowed medical resident Tawana Nix to examine her. Dr. LiVolsi held plaintiff's hand during Nix's examination of her.

8. Plaintiff went back to see Dr. LiVolsi on September 7, 2006. At that appointment, Dr. LiVolsi recommended that plaintiff have a subtotal hysterectomy, which involves removal of the uterus while preserving and leaving in place the ovaries and cervix. LVN Suzanne Mueller was present during the entire appointment.

9. Plaintiff expressed concern during the September 7, 2006 appointment about not being able to have children. Dr. LiVolsi explained that leaving plaintiff's ovaries and cervix in place could allow for the possibility of using her eggs and a surrogate in the future.

10. At the end of the September 7, 2006 appointment, plaintiff consented to having Dr. LiVolsi perform the subtotal hysterectomy she needed.

11. Plaintiff saw a psychologist at SCHC on October 6 and October 12, 2006 for anxiety about the upcoming surgery. She did not tell the psychologist that she perceived Dr. LiVolsi to have done or said anything inappropriate to her; nor did she express any concerns about Dr. LiVolsi performing the surgery.

12. Dr. LiVolsi performed a subtotal hysterectomy on plaintiff at Shasta Regional Medical Center on October 17, 2006. After the surgery, Dr. LiVolsi visited plaintiff in the surgery recovery room, where he showed plaintiff surgery photographs of her uterus. Plaintiff did not want to see the pictures and asked if she could see them later. Dr. LiVolsi then gave the pictures to plaintiff's mother and sister who were waiting outside the recovery room.

13. Dr. LiVolsi examined plaintiff while she was hospitalized at the Shasta Regional Medical Center following her surgery on October 18 and 19, 2006. The surgical incision is "in a bikini cut right above the pubic symphysis;" it is horizontal incision, about four to six inches in length across the top of the mons, "at least four finger breaths" below the belly button. Plaintiff complains that her pubic area was

|   |   |   |
|---|---|---|
| 1 |  | unnecessarily exposed when Dr. LiVolsi examined the surgical |
| 2 |  | area, since Dr. LiVolsi caused this exposure by pulling the |
| 3 |  | blanket covering her to the mid-portion of her thighs.  Dr. |
| 4 |  | LiVolsi could not recall examining plaintiff, and testified |
| 5 |  | about his ususal practice of peeling the blanket or sheet down |
| 6 |  | to expose the pubic area and the incision.  He explained he |
| 7 |  | looks for redness, any kind of secretion, and the possibility |
| 8 |  | of infection.  The trial record does not support plaintiff's |
| 9 |  | position that where Dr. LiVolsi placed the blanket constituted |
| 10 |  | sexual misconduct. |
| 11 | 14. | Plaintiff was discharged from the Shasta Regional Medical |
| 12 |  | Center on October 20, 2006, and was scheduled to see Dr. |
| 13 |  | LiVolsi at SCHC for a post-operative exam two weeks later. |
| 14 | 15. | Plaintiff's mother accompanied her to her two-week |
| 15 |  | post-operative exam on November 2, 2006.  Plaintiff's mother |
| 16 |  | and LVN Mueller were present during the entire examination. |
| 17 |  | Plaintiff testified that in lieu of a handshake, Dr. LiVolsi |
| 18 |  | told her he wanted a hug and a kiss.  Dr. LiVolsi testified he |
| 19 |  | never said anything to a patient initiating a hug or a kiss. |
| 20 |  | Dr. LiVolsi indicated that during his over forty years of |
| 21 |  | practice certain patients are grateful for something he has |
| 22 |  | done and show their affection. |
| 23 | 16. | At the end of the November 2, 2006 appointment, plaintiff was |
| 24 |  | instructed to return in four weeks for a follow-up appointment |
| 25 |  | with Dr. LiVolsi. |
| 26 | 17. | Plaintiff appeared for her follow-up appointment on November |
| 27 |  | 30, 2006.  The appointment included a pelvic exam so that Dr. |
| 28 |  | LiVolsi could see how plaintiff had healed after her surgery. |

Plaintiff testified she was nervous about the pelvic exam, and did not want it because Dr. LiVolsi had already made her "kind of nervous," but she knew she had to have it so she could have papers signed allowing her to return to work. She testified her legs were shaking because she was really uncomfortable, and that Dr. LiVolsi told her to relax; and said, in a sexually suggestive manner, he didn't know why she was nervous since they "had already been very intimate before." The trial record reveals that even if this statement was made, it does not reference anything other than Dr. LiVolsi's prior treatment and examination of plaintiff. Dr. LiVolsi wore gloves during the examination. Plaintiff testified that Dr. LiVolsi caused bleeding during the exam because he was too hard with the speculum. At some point during the pelvic examination, plaintiff realized Dr. LiVolsi "had stopped examining [her] pretty much." Plaintiff then asked him if she could sit up. Plaintiff testified that Dr. LiVolsi replied, "you can or you can stay just the way you are, I like it." Plaintiff testified that Dr. LiVolsi was face level with her private area when he made that comment. This testimony, however, does not support drawing the inference that Dr. LiVolsi was located in a position other than where he was supposed to have been for the examination. Since plaintiff testified Dr. LiVolsi "had stopped examining [her] pretty much," this testimony does not establish that the pelvic exam was finished at the time plaintiff made her inquiry. Nor does the record support drawing the inference that what Dr. LiVolsi liked was anything other than plaintiff's position for the

|   |     |                                                                 |
|---|-----|-----------------------------------------------------------------|
| 1 |     | exam.  LVN Mueller was also present during the entire           |
| 2 |     | examination.  Plaintiff also testified Dr. LiVolsi told her     |
| 3 |     | she was too beautiful to be so fat and she needed to loose      |
| 4 |     | forty pounds.                                                   |
| 5 | 18. | Plaintiff testified that after the examination concluded, LVN   |
| 6 |     | Mueller left the examination room before Dr. LiVolsi, and as    |
| 7 |     | Dr. LiVolsi was exiting, he told plaintiff: "you are a          |
| 8 |     | beautiful woman; I would take you any day, any time, I would    |
| 9 |     | take you."  Plaintiff testified this statement made her feel    |
| 10|     | disgusted, angry and humiliated.                                |
| 11| 19. | Plaintiff testified that after Dr. LiVolsi made that last       |
| 12|     | statement, she had a flashback that Dr. LiVolsi may have        |
| 13|     | sexually battered her while she was unconscious after her       |
| 14|     | surgery.  Plaintiff, however, stipulated that no sexual         |
| 15|     | battery did in fact occur.  Plaintiff further testified that    |
| 16|     | this statement colored all of Dr. LiVolsi's prior conduct and   |
| 17|     | comments, and showed that his prior care and treatment of her   |
| 18|     | was a pretext for sexual misconduct.  However, the trial        |
| 19|     | record does not show a nexus exists between Dr. LiVolsi's       |
| 20|     | prior conduct and comments and this final statement.  "A        |
| 21|     | doctor rendering gynecological care . . . cannot render the     |
| 22|     | full panoply of gynecological services without touching,        |
| 23|     | probing or otherwise manipulating a woman's genitalia. Thus     |
| 24|     | when a gynecologist is accused, as here, of committing a        |
| 25|     | sexual [misconduct] in the course of rendering gynecological    |
| 26|     | services, that accusation is necessarily "directly related" to  |
| 27|     | the manner in which the gynecological services were rendered."  |
| 28|     | Cooper v. Superior Court,56 Cal.App.4th 744, 751 (1997).        |

|   |     | |
|---|-----|-|
| 1 |     | Plaintiff has not shown that the gynecological services |
| 2 |     | rendered were a guise or pretext allowing Dr. LiVolsi to |
| 3 |     | engage in sexual misconduct with her. |
| 4 | 20. | Evidence is not in the record supporting plaintiff's claim |
| 5 |     | that she suffered severe emotional distress because of the |
| 6 |     | take you anytime statement. Plaintiff testified that as a |
| 7 |     | result of Dr. LiVolsi's conduct and comments, she fears |
| 8 |     | gynecological exams and doctors. But plaintiff also testified |
| 9 |     | she disliked gynecological exams even before she met Dr. |
| 10 |    | LiVolsi. Plaintiff also testified she had nightmares. |
| 11 |    | However, plaintiff never missed work, and her nightmares were |
| 12 |    | few and ended not long after she last saw Dr. LiVolsi. |
| 13 | 21. | Plaintiff has not sought mental health treatment from anyone |
| 14 |    | as a result of Dr. LiVolsi's statement. |
| 15 | 22. | Defendant's expert psychologist, Dr. Robert Asarnow, explained |
| 16 |    | that when he saw plaintiff in November 2008, plaintiff |
| 17 |    | described herself as being mildly depressed, and that the |
| 18 |    | biggest stress in her life was the litigation involving her |
| 19 |    | claim against Dr. LiVolsi. Dr. Asarnow opined since plaintiff |
| 20 |    | failed to seek any mental health or other treatment resulting |
| 21 |    | from her interactions with Dr. LiVolsi, this failure suggested |
| 22 |    | that those interactions "had very little impact on the overall |
| 23 |    | scope of her life;" and this "is an indication that she's |
| 24 |    | currently not suffering from clinically significant |
| 25 |    | psychiatric problems." Dr. Asarnow further explained that |
| 26 |    | taking what plaintiff told him "at face value," in terms of |
| 27 |    | the symptoms she was experiencing the day he saw her: "I would |
| 28 |    | end up saying that this is a woman who's not currently |

suffering from depression, she's not anxious, she doesn't require treatment, and it turns out she reached that judgment herself some months later."

## II. CONCLUSIONS OF LAW

23. This case arises under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), and concerns plaintiff's IIED claim against the United States based on Dr. LiVolsi's conduct and comments.

24. Defendant's January 12, 2010 motion in which it renewed its earlier motion to dismiss for lack of subject matter jurisdiction under 28 U.S.C. § 2680(h), is denied. The allegations tried do not arise out of assault, battery or sexual battery.

25. The substantive law of the state of California governs Plaintiff's IIED claim. See 28 U.S.C. § 1346(b)(1); Richards v. United States, 369 U.S. 1, 9 (1962)(stating that "the Government's liability is to be determined by the application of . . . the law of the place where the act or omission occurred . . . .").

26. To prevail on her IIED claim under California law, Plaintiff must establish three elements by a preponderance of the evidence: "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." Hughes v. Pair, 46 Cal.4th 1035, 1050 (2009)(quotations and citation omitted).

27. "A defendant's conduct is outrageous when it is so extreme as to exceed all bounds of that usually tolerated in a civilized community . . . . If properly pled, a claim of sexual harassment can establish the outrageous behavior element of a cause of action for intentional infliction of emotional distress." Id. at 1050-51 (quotations and citations omitted). However, "liability for intentional distress does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." Id. at 1051 (quotations and citations omitted). Further, "the defendant's conduct must be intended to inflict injury or engaged in with the realization that injury will result." Id.

28. The California Supreme Court has set a "high bar" for satisfying the second element. Plaintiff must show severe or extreme emotional distress. id. "Severe emotional distress means emotional distress of such substantial quality or enduring quality that no reasonable person in civilized society should be expected to endure it." Id. (affirming lower court's determination that plaintiff's allegations that she had suffered "discomfort, worry, anxiety, upset stomach, concern and agitation as a result of defendant's comments to her" did not constitute severe or extreme emotional distress)(quotations and citations omitted). Further, "[i]t is clear that a mere momentary or transitory emotional distress is insufficient to constitute severe emotional distress." Kiseskey v. Carpenters' Trust for Southern California, 144 Cal. App. 3d 222, 231 (1983).

## III. **FINDINGS OF LAW AND FACT**

29. Plaintiff has failed to establish by a preponderance of evidence that she suffered the requisite severe or extreme emotional distress to prevail on her IIED claim.
30. The trial record reveals plaintiff only became distraught after hearing Dr. LiVolsi's final statement about being willing to "take her anytime."
31. However, this statement did not cause plaintiff suffer severe or extreme emotional distress.
32. Plaintiff's distress was transitory in nature, and did not interfere with her daily life, including her ability to work.
33. Although plaintiff claims Dr. LiVolsi's conduct and comments has caused her to fear gynecological exams and doctors, the evidence does not support these claims.
34. Further, the fact that plaintiff did not consult a psychiatrist, psychologist, or other medical provider regarding her claimed emotional distress supports the Court's finding that any emotional distress she suffered was not sufficiently severe. See Bolton v. Pentagroup Financial Services, LLC, No. CIV-F-08-0218, 2009 WL 734038, at *24-25 (E.D. Cal. Mar. 17, 2009)(holding that plaintiff who did not contact a doctor or take any prescription drugs for alleged distress did not suffer severe and extreme emotional distress to establish IIED)(citing Girard v. Ball, 125 Cal. App. 3d 772, 787-88 (1981)(sleeplessness, anxiety and nervousness for which plaintiff sought no medical treatment) & Costa v. National Action Financial Services, 634 F. Supp. 2d 1069, 1079 (E.D. Cal. 2007) (stating plaintiff's sleeplessness, shaky

hands and anxiety for which plaintiff did not see a doctor or take medication insufficient to establish severe emotional distress); Paulson v. State Farm Mut. Auto Ins. Co., 867 F. Supp. 911, 919 (C.D. Cal. 1994) (finding no severe emotional distress where plaintiff who claimed to suffer frustration, depression, nervousness and anxiety did not seek medical care).

35. At most, any emotional distress plaintiff experienced was "garden variety," which is insufficient to establish IIED under California law. See Hughes, 46 Cal. 4th at 1051.

36. Therefore, any emotional distress suffered by plaintiff as a result of Dr. LiVolsi's comments was not "emotional distress of such substantial quality or enduring quality that no reasonable person in civilized society should be expected to endure it." Id. at 1051. Accordingly, plaintiff does not prevail on her IIED claim.

## IV. CONCLUSION

Since plaintiff has not demonstrated by a preponderance of the evidence that she suffered severe emotional distress, she does not prevail on her IIED claim. Therefore, judgment shall be entered in favor of defendant.

Dated: March 11, 2010

GARLAND E. BURRELL, JR.
United States District Judge

11